IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RYAN BEER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 12-1391 |
| | : | |
| AGCO CORPORATION, | : | |
| | : | |
| Defendant. | : | |

Goldberg, J.                                                             August 4, 2014

<u>MEMORANDUM OPINION</u>

## I.  <u>INTRODUCTION</u>

Plaintiff Ryan Beer sustained serious injuries, including the loss of his left hand, as a result of an accident involving a combine manufactured by Defendant Agco Corporation. Plaintiff filed this strict liability and negligence action, alleging that Defendant failed to properly guard against inadvertent contact with the combine's moving parts.[1]  Presently before us is Defendant's motion for summary judgment.  For the reasons discussed below, the motion will be denied.

## II.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff was injured on October 30, 2012, when his grandfather, Kenneth Beer (hereinafter "Kenneth"), was operating the Gleaner R65 combine in question.  This machine is used to harvest soybeans.  Plaintiff does not remember the events of that day, and while Kenneth did not witness the accident, he describes the circumstances surrounding it as follows.

---

[1] The complaint also contains a breach of warranty claim, but Plaintiff has indicated that he does not intend to pursue this claim.

While operating the combine in a field, Kenneth observed that the rock trap indicator light was turned on, indicating that a rock had been pulled into the machine.  (Pl.'s Stat. of Facts ¶ 2.)  Kenneth drove the combine from the field back to the farm and asked Plaintiff to help him clean and close the rock trap, which is located on the right side of the combine.  (Id. at ¶ 5.)  Gaining access to the trap requires lowering a step platform and raising a side shield that covers much, but not all of the right side of the machine.  The trap is then "raked" using a device stored on the combine.  The trap must then be closed using a wrench in order to turn off the indicator light and alarm inside the cab.  Kenneth and Plaintiff cleaned and closed the trap as set forth above.  (Id. at ¶¶ 5-7; Kenneth Beer Dep., pp. 101:8-103:22.)

After Kenneth returned to the cab and turned the engine back on, he noticed that the gear controlling the combine's thresher operation had inadvertently been shifted out of the "high" position.  (Pl.'s Stat. of Facts ¶¶ 8-9.)  Because the gear shift lever is located near the rock trap, Kenneth believed that it had been shifted inadvertently while he and Plaintiff were cleaning the trap.  (Kenneth Beer Dep., pp. 51:16-52:2.)  As the machine must be set to high gear in order to harvest soybeans, Kenneth called to Plaintiff, who was seated in a utility vehicle on the left side of the combine, and asked him to reset the gear.  (Pl.'s Stat. of Facts ¶¶ 10-12.)  As Plaintiff drove around the back of the combine toward the area of the gear shift lever, Kenneth turned the combine's engine and operating functions off.  (Id. at ¶ 13.)  While Plaintiff was in the area of the gear shift lever and out of Kenneth's sight, his left arm became entangled in a moving sheave, causing numerous severe injuries, including a nearly severed left hand that was later amputated, broken bones, lacerations, bruises, nerve damage and loss of teeth.  (Pl.'s Stat. of Facts ¶ 17; Compl. ¶ 10.)

At deposition, Plaintiff testified that in order to shift gears, he would first lower the step platform and raise the side shield, which would expose the area of the gear shift lever, as well as the sheave to its right.  (Ryan Beer Dep., pp. 86:18-89:16.)  However, even with the shields closed, there is a thirteen-inch space between the step platform and the drive assembly containing the sheave.  (Pl.'s Stat. of Facts ¶ 19; Def.'s Stat. of Grounds ¶ 3.)  To the right of the step platform, closer to the right front tire, is another open space, which Defendant states is ten inches.  (Def.'s Stat. of Grounds ¶ 3.)  Thus, it is undisputed that even with both the step platform and side shield closed, there is an open area which allows access to the sheave.[2]

According to Plaintiff's biomechanical expert[3], upon contact, friction between Plaintiff's arm and either the sheave or the belt wrapped around the sheave pulled Plaintiff's arm downward into a pinch point between the sheave and a metal bar to its right.  (Def.'s Mot., Ex. C, pp. 13-14.)  Although Kenneth states that he had turned the engine and other functions off, Plaintiff's expert testing shows that the sheave in question can take between nine and sixteen seconds to coast to a stop after losing power.  (Id. at p. 15.)  Plaintiff notes that it takes between six and eight seconds to drive the utility vehicle from the left side of the combine to area of the accident. (Aff. of Ryan Beer.)  Thus, the time sequence described above would allow for Plaintiff to be present at the right side of the machine while the sheave was still turning.

Police Officer Matthew Reiss was dispatched to the farm shortly after the accident occurred.  (Def.'s Stat. of Facts ¶ 21.)  Reiss testified that he spoke to Kenneth, who was "clearly panicked."  (Def.'s Stat. of Facts ¶ 22; Reiss Dep., p. 27:3-5.)  According to Officer Reiss,

---

[2] Attached to this Opinion is a photograph of the right side of the subject combine, where Plaintiff's accident occurred.

[3] Biomechanics is "the study of the mechanical laws relating to the movement or structure of living organisms."  "biomechanics." Oxford Dictionaries. 2014.  http://www.oxforddictionaries.com (15 July 2014).

Kenneth recounted that immediately prior to the accident, he had leaned out of the combine's cab and yelled to Plaintiff to fix the machine's linkage, which had become stuck.[4]   Kenneth explained that the linkage gets stuck occasionally and that Plaintiff knew what to do in such a situation.  (Def.'s Stat. of Facts ¶ 22; Reiss Dep., p. 27:5-12.)  Reiss asked Kenneth whether the machine was still running at the time, to which Kenneth responded "no, I didn't turn it off, it was still running."[5]   (Def.'s Stat. of Facts ¶ 23; Reiss Dep., p. 27:22-24.)   Kenneth repeatedly explained that he had instructed Plaintiff to go "under there," and that had he not done so, the accident would not have occurred.  (Def.'s Stat. of Facts ¶ 26; Reiss Dep., p. 52:6-20.)  Kenneth showed the linkage to Reiss, who relayed that it was located directly above a "flywheel" with a belt wrapped around it.  (Def.'s Stat. of Facts ¶ 28; Reiss Dep., p. 31:1-5.)

Plaintiff filed his complaint on March 19, 2012, alleging that Defendant was negligent and the combine defective for not including a guard to prevent inadvertent contact with the machine's moving parts, particularly the sheave.  Plaintiff contends that a proper guard blocking access to the sheave would have prevented his injuries, and that such a guard is in fact required by American National Standards Institute ("ANSI") safety standards.  Defendant has filed a motion for summary judgment, arguing that because Plaintiff has no memory of the accident and Kenneth did not see it occur, Plaintiff cannot prove that Defendant's failure to provide guards was the proximate cause of his injuries.

---

[4] While not clear from Defendant's briefs, at oral argument, defense counsel explained that the "linkage" refers to the mechanism that resets the rock trap indicator light and alarm in the cab when the trap door is closed. (Oral Arg. Tr. P. 34.)

[5] As discussed above, Kenneth now claims to have turned the combine's engine and all operating functions off before Plaintiff contacted the sheave.

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"

that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A).

## IV.   <u>DISCUSSION</u>

Plaintiff alleges both negligence and strict liability.   Because we sit in diversity, Pennsylvania law applies.  To prove negligence, Plaintiff must show: (1) a duty on behalf of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) breach of that duty; (3) a causal connection between the breach and the injury suffered; and (4) actual damage caused as a result.  <u>Felix v. GMS, Zallie Holdings, Inc.</u>, 501 Fed. App'x 131, 134 (3d Cir. 2012).

The Restatement (Second) of Torts § 402A imposes strict liability on the manufacturer of a defective product that is unreasonably dangerous to the user.  <u>Pavlik v. Lane Ltd./Tobacco Exporters Int'l</u>, 135 F.3d 876, 881 (3d Cir. 1998).  To recover under a strict products liability theory, Plaintiff must show: (1) the product was defective; (2) the defect caused his injuries; and (3) the defect causing the injury existed at the time the product left Defendant's hands.  <u>Hadar v. AVCO Corp.</u>, 886 A.2d 225, 228 (Pa. Super. Ct. 2005).

Defendant's summary judgment motion turns on the issue of causation.  To prevail on a design defect theory under either a negligence or strict liability standard, Plaintiff must show that the alleged defect—in this case, the absence of guards in the area of the accident—was a substantial contributing factor in bringing about his injuries.  <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 366-67 (3d Cir. 1990).  Plaintiff may do so through circumstantial evidence, which is defined as "a mere preponderance of probabilities," but the circumstances must be strong enough that they can reasonably form the basis of a jury's conclusion.  <u>Ortzian v. McNeilus Truck & Mfg. Inc.</u>, 354 Fed. App'x 668, 671 (3d Cir. 2009) (quotation omitted).  When the facts

show that the defect is not responsible for the injury, or that the causal connection between the defect and the injury is remote, the question of causation is decided by the court as a matter of law.  <u>Robertson</u>, 914 F.2d at 367.  Defendant urges that because Plaintiff cannot establish how his accident occurred, or that inadvertent contact with the sheave is even possible with the existing shields in place, Plaintiff cannot prove that the absence of guards caused his injuries.

Plaintiff responds that the reports of two expert witnesses create an issue of fact on causation.  The first, Gary Huitink, is offered as an engineering expert.  Huitink performed a safety analysis on the combine, concluding that Defendant failed to properly guard the moving parts of the drive assembly in violation of mandatory ANSI safety standards.  (Def.'s Mot., Ex. B, p 7.)  Huitink opines that the exposed drive was accessible, even without opening either of the shields, to a person approaching from behind the front right tire.  Huitink states that the fifteen-inch gap between the closed step platform and the "pinch/shear/crush" point where Plaintiff's arm became entangled is far less than the thirty-six inches, i.e. an arm's length, required by ANSI standards.  (<u>Id.</u> at pp. 7, 9.)  Huitink notes several routine tasks that must be performed either behind the tire or elsewhere on the right side of the combine, including shifting gears. (<u>Id.</u>)  Huitink proposes three options for guarding the drive assembly, and while he offers no opinion as to how Plaintiff came into contact with the sheave, he concludes that "with a proper guard in place, unplanned operator contact is not possible and entanglement doing normal tasks cannot occur." (<u>Id.</u> at p. 18.)

Plaintiff's second expert, Dr. Catherine Corrigan, specializes in biomechanics.  Corrigan analyzed Plaintiff's medical records, as well as the combine, in order to determine the biomechanics associated with Plaintiff's injuries.  While she does not opine as to exactly how Plaintiff's arm came into contact with the sheave, Corrigan states that "[a] loss of balance or an

accidental fall while working in this space...could allow an individual's arm to contact the sheave wheel or the belt attached to the sheave wheel due to the open gap of approximately one foot between the sheave and the step shield." (Id. at p. 14.)  Corrigan concludes that Plaintiff's injuries are the result of accidental contact with the sheave or the belt wrapped around it, which drew his arm into a pinch point between the sheave and a metal bar to its right, while Plaintiff was in or approaching the space between the tire and the step platform.  (Id.)

Defendant argues that the above expert reports offer nothing more than speculation as to how Plaintiff came into contact with the sheave, and therefore do not establish that the failure to guard was the cause of his injuries.  Defendant likens the case before us to two decisions in this Circuit governing the issue of causation.  We find each case to be distinguishable.

In Fedorczyk v. Carribean Cruise Lines, LTD., 82 F.3d 69 (3d Cir. 1996), the plaintiff was injured when she slipped and fell in a cruise ship bathtub.  The bathtub floor was covered with four textured, nonslip strips, but the strips were spaced so that it was possible for the plaintiff to stand in the tub with her feet in between them.  Although the plaintiff could not remember whether she had been standing on a strip at the time of her accident, her expert testified that the defendants were negligent for failing to adequately treat or texturize the tub, and that this was the cause of the fall.  Plaintiff's expert conceded, however, that other variables, such as the presence of bath oil and soap on the floor could cause a fall under any circumstances. Id. at 72.  The court affirmed the district court's grant of summary judgment in the defendants' favor, stating that the conclusion that inadequate stripping caused the plaintiff's fall was "not based on any direct or circumstantial evidence of where she was standing when she fell." The Court also rejected the inference that she was standing in between the strips as "pure speculation." Id. at 75.

Here, there is evidence beyond mere speculation that Plaintiff contacted the sheave inadvertently while attempting to shift gears.  Unlike the plaintiff in <u>Fedorczyk</u>, who could provide no basis whatsoever for determining whether she was standing on a strip at the time of her fall, Plaintiff's theory of how the accident occurred relies on Kenneth Beer's testimony that he told Plaintiff to shift gears, prompting Plaintiff to approach the gear box, and Plaintiff's testimony that he would have had no operational reason to reach into the area of the sheave. Thus, there is some basis from which a jury can draw conclusions about what Plaintiff was doing and how he was positioned at the time of the accident.

The second case relied upon by Defendant, <u>Ortzian v. McNeilus Truck & Mfg. Inc.</u>, 354 F. App'x 668 (3d Cir. 2009) involved a plaintiff who was injured when he fell from a platform affixed to a concrete mixing truck.  The plaintiff had no recollection of how he fell, but argued through an expert that had the platform been equipped with a guard to prevent the possibility of falling through a gap in its railing, the accident would not have happened.   <u>Id.</u> at 670. Specifically, the expert testified that his proposed modification would prevent falls from occurring during the "normal task."  However, the expert acknowledged that a fall could still result from "some incident of negligence."  <u>Id.</u> at 671.  Relying on <u>Fedorczyk</u>, the court found that with no memory or witnesses to establish what he was doing or how he was positioned on the platform, the plaintiff could not prove that the absence of a proper guard rail caused his fall. <u>Id.</u> at 671.  The court noted that the expert had failed to define the "normal task," and that the plaintiff could not establish whether he was engaged therein, or that he had taken appropriate measures to ensure his own safety.  <u>Id.</u>

This case is also distinguishable.  In <u>Ortzian</u>, "all of the facts as to how [the plaintiff] was positioned before the fall, such as the location of his free hand, [were] unknown," and therefore

any conclusion that the proposed modifications would have prevented his fall would rely on "sheer speculation."   Id. at 672.   Here, there exists evidence that Plaintiff was approaching the area of the accident in order to shift gears when he contacted the sheave.   Further, unlike the plaintiff's expert in Ortzian, who failed to define the "normal task," Plaintiff's engineering expert describes releasing the side shield clamp to access the gearbox as a "routine procedure" performed near the sheave and states that entanglement doing such normal tasks would not have been possible with his proposed modifications in place.   (Def.'s Mot., Ex. B, p 13, 18.)   In contrast to Fedorczyk and Ortzian, there is evidence linking the alleged defect to Plaintiff's injuries.

In short, Fedorczyk and Ortzian stand for the proposition that proof of a defect combined with a mere possibility of causation is not enough to reach a jury.   Fedorczyk, 82 F.3d at 75. Where there is at least some evidence linking the defect to the plaintiff's injuries, however, those cases are not applicable.   See, e.g., Tormenia v. First Investors Realty Co., 251 F.3d 128, 134 (3rd Cir. 2000) (court declined to apply Fedorczyk where the plaintiff was injured by a revolving door that the defendant failed to maintain and the plaintiff's expert testified that the door malfunctioned due to a contaminant in the speed-control device); Tentoni v. Jeffers, 2011 WL 113797, at *4 (D.N.J. Jan. 13, 2011) (Fedorczyk did not apply where expert drew conclusions about the circumstances of the plaintiff's car accident from evidence such as marks on the road).

Particularly instructive is Picariello v. Safway Servs., LLC, 2012 WL 3704782 (E.D. Pa. Aug. 28, 2012), where the plaintiff fell while attempting to climb over a rail connecting one section of scaffolding to another.   While the plaintiff could not remember precisely how he fell, he argued that the scaffolding should have been equipped with a "swing gate," which would have allowed him to pass between the two sections without having to climb over the rail.   The court

distinguished <u>Fedorczyk</u> and <u>Ortzian</u> and denied summary judgment, finding that by demonstrating that a swing gate would have eliminated the need to climb over the rail altogether, the plaintiff had introduced some evidence whereby a jury could find that the failure to include a gate was the proximate cause of his fall.  <u>Id.</u> at 10.

Similarly, here, Plaintiff has introduced the following evidence, which, if believed, could lead a jury to find that Defendant's failure to install guards around the sheave caused his injuries: Kenneth Beer testified that he instructed Plaintiff to shift the thresher into high gear, prompting Plaintiff to move in the direction of the gear shift lever.  Plaintiff testified that he had no operational reason to reach his hand into the area of the accident, and that he did not believe that it was possible to reach the gear shift lever in this manner with the existing shields closed. Plaintiff's biomechanical expert opines that Plaintiff's injuries are consistent with having become entangled in the sheave accidentally while in or approaching the open area between the step platform and the tire.  Plaintiff's engineering expert states that a proper guard around the sheave would have prevented unplanned operator contact during normal tasks such as shifting gears.  Thus, Plaintiff has pointed to sufficient evidence, which, if believed, could establish that he contacted the sheave inadvertently while performing a normal task, and that such contact would not have occurred with proper guards in place.

We disagree with Defendant's contention that there is no evidence establishing that it is possible to contact the sheave inadvertently.  Defendant underscores that Huitink performed no accident reconstruction, while Corrigan could not rule out the possibility that Plaintiff's injuries resulted from his reaching into the area intentionally.  While both claims may be true, we find that Plaintiff's experts can establish that inadvertent contact is possible so to create an issue of material fact.  Specifically, having inspected the combine, Corrigan concludes that a fall or loss

of balance could result in accidental contact with the sheave. Huitink plainly states that "considerable and abundant access" existed between the step platform and the drive assembly, endangering the combine's operators. (Def.'s Mot., Ex. B, p 9.) While Defendant's evidence may refute many, if not all of the above assertions, these are issues of fact that will be left to a jury.

**V.  <u>CONCLUSION</u>**

For the reasons set forth above, Defendant's motion for summary judgment will be denied. An appropriate order follows.